Good morning everyone. So good to have you all. Before we begin, I just want to note for one and all that this is a very special day. We have our two, the two circuit with us. And well, I'm just thrilled. And lawyers, you have to be kind to them. Okay. Gosh, this is a special day. All right. Let me just note for those of you in the next cases that are coming up, that after the first case, we will take a 10 minute break. All right. And now I will call our first case of the day. And appeal number 2048 et al. And United States v. Kentrevion Watkins et al. And first up we have, is Ms. Eisenman here? Good morning, Judge. Indeed she is. Thank you so much. Good morning. May it please the court, Vanessa Eisenman for Kentrevion Watkins. I'll be arguing the joint Regarding Batson, this is the rare case where this court should remand not for an evidentiary hearing, but for a new trial. Because the record compels the conclusion that the government struck two jurors on the basis of race. In fact, the government succeeded in orchestrating an all white jury for the trial of 13 black defendants due to serious, clear errors at every step in the Batson analysis. You know, forgive me, I'm going to stop you. You've all argued in the reply brief that the court cut counsel off, did not allow him to make a record beyond the pattern rationale. What I have been wondering is this. Was there anything that prevented counsel from making a proffer of other reasons to find that race was the reason for the strikes? In other words, what prevented you from making your record here? Yes, I do think if you look at the transcripts, it becomes clear that the court and the government Both cut off defense counsel multiple times when he was trying to add more. But I don't think that that's dispositive, Judge. I think that it's clear from the record that there was more Here than just pointing to the jurors race. And that's if you look at 26 if you look at 58 if you look at them together. There was more. It wasn't. Oh, I'm sorry. No, okay. It wasn't just that the African American black defendant or juror was struck. It was that was the only Black juror on the panel that was struck. And this is a trial of 13 black defendants and the final jury is all white. That is not just pointing to a juror's race and saying that's it. So the Defense Council, I think, did an admirable job of putting on the record, more than just the government struck Black juror. He said the government struck the only black juror on the panel, the government struck the only Hispanic American on the panel and use two out of its three strikes to eliminate to minority group. From the panel and the final jury was all white. So that is more this this court's cases support that looking at the final jury competition, looking at how many possible minority jurors were on the panel. That's all additional evidence. That's not just pointing to a juror's race. I'm sorry. Yes, no. Actually, so the judge determined appeared to make a finding that with regard to the second juror number 58 that he could not determine whether or not the number 58 was part of a minority group. What is the standard of review for us to review that decision? And how should we go about it? Yeah, I think I'm comfortable saying that that's a factual finding that this court can review for clear error, but I'm totally comfortable saying that that was a clear error. I mean, the court admits on the record that this is a woman with a dark complexion. She has a heavy Hispanic accent and the audio has been preserved. She is a Spanish teacher and she has a Spanish first and last name, which is known to the council and to the judge. That is quite enough to make a finding that that was Hispanic or at least identifiable as Hispanic. It doesn't matter what the government thought. This the only question at step one is whether there was a mere inference of a discriminatory purpose. Let me ask you a question about that, because the judge said, you know, I can't tell whether this what this woman's race is one way or the other. And the judges, they're looking at the woman. He's in the courtroom. We are not. We have this black and white record. Thank you for the audio. We have a black and white record. Um, defense counsel launched this as a race challenge under Batson, but Batson also covers ethnicity. And our national definitions of Hispanic, if you look at the Census Bureau, if you look at other government agencies, Hispanics covers everything from folks from South and Central America. Uh, to people of Hispanic origin, no matter the country of origins that would include Hispanic people from Europe, regardless of race, which is why we see these listings Hispanic, white, Hispanic, not white. So, my question for you is, are we are we stuck with defense counsel's categorization? Of this as a race challenge under Batson rather than one of ethnicity, where it does not matter if the court or anyone in the courtroom can tell what race she is, if there is a fair inference that she is Hispanic. Yes, no, I don't think we're stuck with that. I think this court can review all of the factual findings for clear error. And if this court, you know, I think that's a really great point. And I wish I had made that in the brief, but, um, you know, that you've got these. Hispanic first and last name, the Supreme Court re-back in that Castaneda case in 1977, says Hispanic Americans are identifiable. I think the court uses the term race, but ethnicity as well. And you've got someone with an accent and you've got someone who is an ESL teacher, a Spanish teacher. You know, I don't know how much thought we should put in your arguments about names. You all have said on the record, it was her married name. People have all kinds of first names. I don't know how much thought we can put in the fact that she teaches Spanish. Spanish teachers come in all stripes and races and ethnicities. Everything together, though, is a clear finding. And the point is, too, the court did a nice job here. You know, it made some quick findings at first, but that came back and said, you know what? Hey, I might be wrong about this. And it's silly. I think he uses the word silly to go and do this all over again. He just asked the government a simple question. And he asked the government a simple question. Why did you strike 26th and 58th? And let's not forget that the government had a chance to put this all aside, or at least make a better record for this court to review, and the government decided not to. That was an intentional waiver, and the Supreme Court said, you know, anticipated this exact situation and said, in the unlikely event, because this is really unlikely, none of us at defense counsel have heard of this happening before. In the unlikely event that the government refuses to answer a question, refuses to give any race neutral reasons, that is more evidence of pretext. But in that case, and in that, as I recall, in that particular case, the trial court had already made a finding that a prima facie case existed, right? And so then the burden does go to the government. And so I can see how, in that situation, if the government can't meet that burden, then that's something and remain silent. That's something district court should consider in step 3. Here, however, the question seems to be whether or not the district court correctly made its finding as to at step 1, as to juror number 58. Isn't that true? And so isn't that, I'm not sure whether that particular case that you're citing for that proposition is really relevant to our current analysis here. Well, I think Johnson versus California, any Supreme Court case that touches on a situation we have, I believe is relevant, whether it's directly on point in that case, you know, they were dealing with what was the standard of review, right? And the court says, you know, this is a low, low burden at step 1, right? This is any suspicion of a discriminatory purpose. This is not supposed to be hard. This is not preponderance of the evidence. So, yes, that's what they were dealing with. Because in Johnson versus California, the court kicked it at step 1 and never asked. That's not what happened here. This time the court did ask the court said, yes, I'm not changing my findings. So that's not great. But the court came back and said, let's make a record. Let's make a record for the 7th circuit to review and the government gave reasons regarding juror 26 and we submit those reasons. We're not credible and I'm happy to go into that too. But then let me know the government. If the defendants raise any rationale. Other than pattern to make out the prime offensive case, I read the defendants bats and objection as being founded on pattern. In other words, a claim that the government struck all the people color from the 1st panel. Was there any other basis to attribute the selection of these jurors to race? Yes, okay. It was the government that said the word pattern judge, the defense council never said all I'm trying to do is prove a pattern that never happened. The defense council makes a nice record of saying, not only is this your black, but he was the only black on the on the panel. Not only was to disturb Hispanic. She was the only Hispanic on the panel. The government only use 3 strikes and it used 2 out of those 3 to eliminate 2 minority groups from the panel. That has got to be enough to get past a near inference of a discriminatory purpose. And it was the government that came back and said, oh, sounds like defense council is only trying to prove a pattern here. And I can't tell what race 58 is. Therefore, 1 is not a panic. That's all the government characterization of the government. Retain any white jurors who are otherwise comparable to these 2 jurors. No, I did they anybody comparable to the 2 jurors? Well, so you're a 154. I don't know if I'm answering your question. So I'm sorry, but you're 154 was the only other person on this panel that the government struck and the government tries to say, you know, tries to use the apparent reason doctrine here on appeal. It totally does not apply apparent reason. It's like, oh, yeah, right. They were all attorneys. That's why they were struck. That's not at all. What happened here? You're 154 had a lot of problems. She knew she may have had some of the defendants as students. She taught for 32 years, right? And and she had she had bad spine problems and one of the defense counsel even moved to have her struck for cause because he was so concerned about her spine problem. So to say that she is similar to juror 58 is just not at all supported by the record. What about the juror who had the conviction as opposed to the mere arrest that juror? Yeah, so that was what the government now tries to again, pull in those apparent reasons a little bit, but that was also one of the reasons that they gave. So, again, step one is pretty much moot regarding juror 26 because they did give reasons, but for the juror who had the arrest, you know, or juror 26 had an arrest. It was, I believe, 22 years ago for domestic violence, and there's nothing in the record to indicate that that juror was ever convicted. So for the government to come back and say, we struck people who committed crimes again, that's just not supported by the record. There's nothing in the record showing that he committed a crime. There was another juror. I'm sorry. Juror 54 was not struck, but was convicted of shoplifting. So that's a conviction. He admitted on the record that he had pled guilty and committed shoplifting, and the government says, oh, well, that's not as serious of a crime. Again, it just doesn't add up. We have an arrest for something, no conviction. So that's a presumption of innocence. And the other reasons for 26 that the government gave are really, really suspect, including saying that he had lived on the South side of Peoria for many years. The South side of Peoria is a predominantly black part of Peoria. And so using that as a reason to strike him, it leads to its disparate impact and that is more evidence of discrimination. Let me ask you this. Okay, go ahead. No, no, I want you to ask your question and I think we do need to have you argue on behalf of Mr. Watkins. Thank you judge. If we agree with you on your argument, why should we not follow our typical course and remand to the district court for additional findings? Isn't the district court in the best position to determine the credibility of these reasons given by the prosecution? I think that's a great question. I really do think that this is a case where it's just the biggest question is how to remand this because everybody admits that the step three findings aren't there for juror 26, but where? And if this were just juror 26, I think we'd have a tougher argument. I'd still make the argument that this should be a new trial because those reasons don't add up, as I explained, because the lead prosecutor is no longer with the government, because it's been three years. I would make that argument, but it's 58 that really pushes this over the edge. The government does not get to come back and make any race neutral reasons in the district court does not get to do that. That would be totally inconsistent with Supreme Court case law to get another second fight at the apple. So because of that, all you've got regarding 58 is the defense counsel's record that she was the only Hispanic American or Hispanic person on the jury. The government struck her. The government refused to give a reason. If this was such, if these reasons that the government says on appeal are so apparent, why didn't they give it at the time when the court said, give me your reasons regarding 26 and 58? If it was so easy and so apparent, why didn't the government give those reasons? They don't get to do that again. And that's the biggest reason. I believe that this should be remanded for a new trial. This is a big deal. That's a big deal. This time, because you mentioned it, I'm going to ask this question at this point, and I'm not going to hold the time against you. How long before the trial did Mr. Hanna come to the U.S. Attorney's office? Gosh, I'm so sorry, Judge. I have no idea. And you're saying Mr. Hanna, not Mr. Grist? Mr. Grist was the lead attorney. Hanna was another attorney on the case, but he did not make the Batson argument. I see. Okay. It was Mr. Grist. He is no longer with the U.S. Attorney's office. Oh, it's Mr. Grist. The briefs made me think that it was Mr. Hanna who is no longer there. Oh, I'm sorry for that confusion, Judge. I'm not sure about Mr. Hanna. He may have left for private practice as well, but I don't want to be quoted on that. I know that Mr. Grist is no longer, or at least that was our information, that he is no longer with the U.S. Attorney's office. And the government did not say anything to rebut that, so I assume that's not true. Thank you. Do I have a couple minutes for Mr. Watkins? A couple of minutes. Okay. I'll go really, really fast. I know there's a ton of briefs. I can see the stack of briefs in front of Judge Jackson right now. I know there's a lot. But Mr. Watkins, I would just urge the court to just take a quick look. He was the last defendant joined in this conspiracy. He was 14 when some of these actions took place. But the biggest reason to take a look at his sufficiency arguments is that there really was not two predicate acts of racketeering to convict him of conspiracy. He was only convicted of conspiracy. You have to have two predicate acts. He was only, there was only evidence regarding his participation in one act, and that was a gun transfer. And even if you want to believe every possible inference known to man, that's still participating in only one racketeering act. So I would just ask that you take a look at that and really consider reversing his conviction, because he should not have been joined. I mean, there were weeks of testimony, nothing about him. Three witnesses testified about his involvement in that all related to one incident. So thank you for the extra time, Judge. Of course, and you will get your rebuttal. So please don't fret about that. Thank you. Thank you, Judge. All right. Ms. Masters for Mr. Washington. Morning, Ms. Masters. Good morning, Your Honor, and may it please the Court. I represent Lance Washington. My name is Ruth Masters. And what sets Mr. Washington apart in this case is that he stands convicted of the assault with a dangerous weapon and attempted murder of Martel Perkins under a vicar and a related felony in possession 924C count, despite the lack of any evidence that he actually did commit those crimes. There's no forensics, there's no eyewitnesses, there's no electronic or other evidence linking him to the shooting. Indeed, the only eyewitness, who was Mr. Perkins, testified that he is 100% certain that Mr. Washington was not one of his assailants. Today I will explain why the lack of evidence in this matter entitles Mr. Washington to an acquittal or in the least a new trial. When you do, while you do, would you keep in mind, please, that Mr. Perkins said that the shooting happened when he was with Austin Woods near a nightclub. And that is consistent with what Washington told Thomas, Mr. Washington told Mr. Thomas. And is that, would that not corroborate Mr. Washington's confession to Mr. Thomas? Absolutely not, Your Honor. All that means is that people knew that Austin Woods was with Mr. Perkins. It does not make it more likely than not that Mr. Washington's supposed out-of-court confession to shooting Mr. Perkins is true under the standard of more likely true, not even more likely true, beyond a reasonable doubt. That is the only thing that is consistent, is that somebody else was there. And what we know is that is not enough to corroborate a supposed confession because all, at most it shows, is that Mr. Washington was present. It doesn't show that he committed the crime. And we know that out-of-court confessions are not, have to be, there has to be substantial and substantial independent evidence which would tend to establish the trustworthiness of the statement. And the Mr. Austin, the Austin Woods point, just establishes presence. It doesn't establish participation in the crime. And there also is not independent evidence or any evidence outside of these confessions that links Mr. Washington to the crime. No case holds that these supposed confessions can provide a basis for conviction when also they come with the caveat that another person here, Kenwin Crowe, also takes credit for the shooting and states in his confession that somehow Mr. Washington is lying, and he uses the word lying, about his own supposed claim to credit. But does Mr. Crowe also state that both he and Mr. Washington shot at Mr. Perkins? That is about triple hearsay at that point because there is no evidence either, no forensics, no eyewitness, no nothing linking Mr. Crowe to the crime either. There is just nothing linking either of these two men to this crime scene except these out-of-court statements. And that's not enough because at best for the government, that evidence here puts the case in equipoise. And we know that in equipoise that that does not establish proof beyond a reasonable doubt. We've just got all of these statements of people who supposedly did things. I also want to turn for a moment to the notion that Snapchat could be used here because we know that Terry Moss takes the stand, and suddenly he says my client was posting things on Snapchat. There's no proof that the Snapchat accounts even existed, let alone the substance of my client's supposed confession on Snapchat. But if your argument is that Mr. Washington's statements went uncooperative, it appears to me that during the trial the jury did hear testimony from other people cooperating with what Mr. Washington said. At this point, you're saying that those other statements aren't reliable, and they're not based upon reliable evidence. However, the standard at this point is pretty deferential to the government, isn't it? So why isn't it enough that the jury heard testimony, independent testimony, other than statements from Mr. Washington? Why isn't that enough to corroborate Mr. Washington's statements as a matter of law? Because there's no proof that these statements on Snapchat? Is that what you're referring to? Well, just Mr. Crowe's statements, Mr. Moss's statements, they're both cooperating statements, right? And what you're arguing is the weight that the jury should give those statements, but those statements were present before the jury. Mr. Crowe did not testify in court. James Thomas testified. It's Moss who testified that Washington had a 9 or a 40 gun right before a very close in time, I think less than an hour before the shooting of Perkins. And we do know that the police found a 9mm shell casing, so that could be viewed, I suppose, as corroboration to the confession to Moss. He appeared to have no more kind of gun was used, and that's, I think, what Judge Lee is trying to get at. That he had both guns, but he used the 9mm. No, Your Honor, they cannot infer that. When Moss says it was a 9 or a 40 and only the 9 is used in the shooting, there's no evidence my client had a 9mm gun. Maybe it was a 9, maybe it was a 40. Well, only a 9 is used and there's only 9mm shell casings. So again, you've got to, even on review in this court, there's got to be sufficient evidence for a jury to have relied upon to convict beyond a reasonable doubt. And that standard just is not met here. Certainly in the alternative, the judgment here is against the manifest weight of the evidence, and we would ask in the alternative for a new trial. Thank you. Thank you very much, Miss Masters. All right, Mr. Telleher, on behalf of Mr. Dodson. Good morning, Your Honors. Christopher Telleher for Lloyd Dodson. Unless the court directs otherwise, I'd like to address the recusal issue. Members of the criminal law bar often switch sides during their careers. Prosecutor Ronald Hanna did just that, going from defending the bomb squad to four months later, prosecuting them. Excuse me, to joining the U.S. Attorney's Office. Two and a half years after that, another bomb squad investigation began. We know all of this and your time is so short, so I'm jumping in. I certainly understand how this could be perceived as problematic for his former clients. But what unfair prejudice is there to these defendants? In other words, when one is a group, or I should say a member of a group, I suppose, engaged in any kind of activity, isn't there always a risk that one member of the group will give up the group's secrets? In other words, Mr. Hanna certainly owed a duty of loyalty to her. And what duty do these defendants? Well, Your Honor, it's the overlap between the two cases. And the fact that the indictment in the first case covered acts in 2013, and then this case, which also covered acts in 2013 and 2014. And so information, and I'm not trying to sidestep your question, Your Honor, but to get to the heart of it, the first concern is obviously the duty of loyalty to Mr. Herron. But it's also what he learned during that case. And I wouldn't put it in the context of a duty to these defendants. I would put it more as confidential information that was gleaned from his representation of Mr. Herron. Will the record reveal what inside information Mr. Hanna had about the bomb squad from the prior representation? And I mean, other than the temporal overlap, was there any factual overlap? Because the cases appear to cover two distinct time periods, and obviously a different group of people, albeit part of the same gang. And I'm going to ask you a question you may find to add, but how many members of the gang were there? That I don't know, Your Honor. Obviously, I can tell you there was 15 in this, 15 defendants, and 13 in the other case. But it's a substantial number. It's a substantial number. As to your concern, there's nothing in the record explicitly where Mr. Hanna says, whether in camera or out, that he learned this information. In fact, he does say that he has not used or would not use any information in this prosecution. But, you know, obviously it goes beyond that. It's what he learned during that defense and what he learned about the gang, its machinations, and things not only from Mr. Herron, his client, but also from the other defendants and from their attorneys. So there was a lot of information, a lot of knowledge that, again, he learned from his defense. And I would quibble, Judge Woldner, with your point about two distinct time frames. There is an overlap, albeit it's not significant. But, again, 2013, and then additionally, Mr. Hanna was still counsel of record through 2014. So it's two years during that time frame. And additionally, Mr. Herron, he was still serving his sentence when this case began. He had a 60-month sentence. So he was still under the terms of his sentence when Mr. Hanna began this case, the prosecution of this case. So, again, I would ask the court— Why does that make a difference for you? Well, I would argue, again, just the context of this. It just doesn't look good that he has a client who's—and I admit, Your Honor, it's not a central fact. But the fact that his client is still serving this term in addition to the fact that, again, there's an overlap in this time frame, 2013 and 2014. Do you believe that we should be searching for confidential information that you can point to in the record, that it suggests Mr. Hanna learned during his prior representation that came up in this subsequent prosecution? Or is it sufficient to rely on a more generalized notion that there certainly must have been something he learned from this prior representation that would have impacted his subsequent prosecution? Your Honor, certainly. I would go with the latter, frankly, because the record is not—there's nothing in the record. Unfortunately, it wasn't pursued precisely. But, again, we would also argue the appearance, as we point out in the briefs, the appearance of— We're now getting to my question. Was there any factual overlap? There was, Your Honor, on two points. One, the bridge of these two cases, these two different prosecutions, was Raheem Wilson, who essentially was the leader. He died in 2017. He was a central figure. He was the bridge between these two cases. And there was an additional witness—excuse me, an additional defendant in the first prosecution, Nicole B. Carlton, who was interviewed, and this was preserved, this was pointed out in the motion recused in the district court. He was interviewed for this case. So there is some factual overlap. And, again, other than that, there's not substantial amounts of evidence, but it's the appearance of a conflict. And it's the appearance of integrity that we would argue is undermined here because, again, you have a prosecutor who went from one side to the other in a very, very short time frame. And the anomaly of this situation is reflected by the fact there's not many cases. In fact, there's really no cases out there that we found, at least that the prosecution found. There's very little like this where you have a prosecutor going from one side to the other prosecuting the same exact gang. And so we would, again, ask that the integrity of this process be considered in recognizing that the evidence, admittedly, there's not substantial amounts of evidence on this point. And why don't you say a word or two about your client, Mr. Dodson, please? Yes, Your Honor. On that point, there were 42 predicate acts, and Mr. Dodson was named in five. There was a substantial amount of evidence that did not pertain to Mr. Dodson, and that is why he moved to sever his case and he preserved it. And so we would, again, argue that, based on the briefs, there was a substantial amount of prejudicial evidence in this case that did not involve him, and I think some of that would not have gotten in if he had been tried by himself. Much appreciated. Thank you. Thank you for your time. Of course. I'm sorry, Ms. Kelly, for Mr. Haywood. Good morning. Good morning. Thank you, Your Honor. My name is Anise Kelly, and I represent Eugene Haywood. I would like to focus my argument on the insufficient evidence to convict on the murder of Eric Brown and the shooting of Courtney Jones. Mr. Haywood received a life sentence for the killing of Mr. Brown. The video shown at trial shows two people on bicycles. The informant, Faulkner, identifies these people as Johnson and Haywood, but never says which is which. One was wearing a fisherman hat and riding a smaller bike. At trial and in its brief, the government argued this person was not the shooter of Brown. Yet all the evidence at trial established the person wearing the fisherman hat and riding the smaller bike was Mr. Haywood. So Mr. Haywood was not the shooter. In its brief, the government argued that there was no proof that Haywood did not switch hats and bikes with Johnson. Well, that is not the standard. Instead, the standard is there is no evidence that he did switch hats and bikes with Mr. Johnson. It would be an impermissible inference if the jury did, as the government suggests, and make that inference. There was insufficient evidence to convict Mr. Haywood for the killing of Mr. Brown. I would also ask the court to reject the government's position that it doesn't matter who shot Mr. Brown, that Mr. Haywood is still guilty. There is no co-conspirator to the murder of Mr. Brown. The jury found that Mr. Haywood pulled the trigger that killed Brown. That was a specific finding in the verdict. And if Mr. Haywood did not pull the trigger, then Mr. Haywood must be acquitted. No one else was charged with the crime, so there is no co-conspirator. This is not a similar case to Perez, as the government argues in its brief. Also, just a quick point, Mr. Haywood did not waive any of the elements. If the pulling of the trigger is an and in the elements, meaning this has to be proved along with another element. So no elements were waived. As to the shooting of Courtney Jones, the hearsay testimony by Officer Parnell is not harmless error. The identity of Mr. Haywood as the shooter of Jones was admitted as the second layer of double hearsay, after the first layer was not admitted. Would the prosecutor's case have been significantly less persuasive without this statement? The answer is yes. It was the ultimate question for the jury. Who shot Courtney Jones? And Officer Parnell's statement was, Mr. Haywood shot Courtney Jones. It's absolutely not harmless error. But of course, D.D. testified to her identification of Haywood. Yes. And the jury heard directly from the original declarant. She could be cross-examined. So what I'm trying to figure out is what was the harm of Parnell, you know, Officer Parnell, repeating what Jones told him, which was itself a repetition of D.D.'s identification. I mean, I think the jury is going to give the most weight to the original declarant, right? Well, I think Officer Parnell, as an officer of the law, carries weight and carries persuasion. It's true. D.D. was cross-examined, and her testimony was incredible. She first identified Mr. Lewis as the shooter and was texting him in front of Officer Parnell and went to his Facebook page. It's incredible, as the government suggests, that D.D. confused Mr. Lewis and Mr. Haywood. She knew Mr. Lewis well enough to have his text number, and she knew the difference between Mr. Lewis and Mr. Haywood. And so the harm is that statement getting repeated, being said by D.D. and repeated by Officer Parnell, it lends more weight to it and is not harmless, again, because it's the ultimate question for the jury to decide the identity of the shooter. But, Counsel, didn't that situation, or something similar to it, come up in Green, where we found that because the declarant ended up testifying at the trial, as Judge Roper noted here, that that basically mooted or addressed any sort of hearsay objection with regard to the out-of-court statement? I would argue no, Your Honor. So the declarant, in this situation, you have the double hearsay statement. The first layer, clearly, the court disallowed it twice, and it's too far removed as an excited utterance, and yet admitted the second layer as an excited utterance. So I think that is clear error. And even though D.D. was in court and did testify, Officer Parnell is the one who, it was his testimony that that should have been struck. It was his testimony that lended weight to D.D.'s testimony. So whether or not D.D. was cross-examined on it, Officer Parnell repeated the statement, which lends that D.D.'s testimony credibility and weight. So I would argue no, Your Honor, just because D.D. was in court, and that's not the rules of evidence. I mean, in this situation, we have the declarant telling the first party, telling the second party, and then that party coming into court. It's many layers of hearsay. So I would argue it's not the same as cross-examining D.D. I also want to make, if the court will allow me, to make a point that there also was no evidence to establish Mr. Jones was shot to enhance Mr. Haywood's position in the gang. The government switched reasons. First it was because Mr. Jones was a drug dealer, and then it was when that evidence didn't materialize, then it was because he had words with Mr. Haywood's people. However, the people Mr. Jones saw right before the shooting, there was no evidence that they were in a gang. The mere fact that they're black men does not mean that they're in a gang. And the words that Mr. Jones had was, what's up, would not lead a rational jury to conclude that that's the basis for a shooting. So again, there's insufficient evidence to convict on the Brown and the Jones shootings, and I would stand on the rest of my brief on the other issues. Thank you so very much. Okay. Ms. Ellickson for the government. Good morning, Ms. Ellickson. Good morning, and may it please the court. Jenny Ellickson for the United States. I'll start with the jury selection issue, and I'd like to take a step back and talk about the circumstances that were before the district court when the defendants made their vows and objections. This was the end of the first of five voir dire groups, and there were 15 veneer persons who were still left who had not been excused for cause or hardship. The government struck three jurors. One juror was African American, one juror was white, and one juror's race and ethnicity were unclear, although the defendants claimed that she was Hispanic. All three of these jurors had a common feature. They all had connections to areas of Peoria where the bomb squad had committed crimes that were going to be discussed in this trial. I'll start with juror 26. Juror 26 is voir dire. If you read the voir dire transcript, it leaps off the page. One of the very first questions the district court asked was whether any of the veneer persons knew anyone on witness list two. Witness list two was the government's list of protected witnesses. These were witnesses where there was some concern about the defendants knowing that these witnesses were testifying against them. In fact, the court had issued a minute order on October 21, 2019, that made it clear that the defendants themselves were not allowed to see the names on witness list two. This is because the security issues that had arisen relating to witnesses, as we talk in our brief at various points about some of the intimidation that witnesses faced from members of the bomb squad. Juror 26 was the only person in that voir dire group, and in fact in any voir dire group, who knew anyone on witness list two. It turns out that he knew one of the victims of the bomb squad's arson attack. As soon as juror 26 said that, that immediately prompted a sidebar between juror 26 and the court because the court didn't want juror 26 to discuss the witness's name in open court. Once the judge talked to juror 26, the judge then convened all of the attorneys in chambers with none of the veneer persons present to talk about what to do about juror 26. At the beginning of that colloquy, one of the defense attorneys suggested excusing the juror. After some negotiation about how to handle the fact that this juror was acquainted with one of these witnesses on witness list two, everyone went back in the courtroom and juror 26 answered additional questions without using the witness's name. But again, later in voir dire, the judge asked another question. Do any of you have ties to South Peoria? Have any of you lived in South Peoria? Again, juror 26 was the only juror who said that he had. And when the judge asked additional questions about where he lived, juror 26 revealed that he lived in a very small, few block area that was the heart of the gang squad's territory. The gang squad's main corner was at Arriaga Street and Star Street. Both of those street names were mentioned when the judge talked to juror 26 about where he lived. Juror 26 specifically mentioned that he lived near Logan Park. Logan Park featured in several instances of trial, including, it was related to the gun swap where he would have obtained a gun before the murder of Eric Brown. So juror 26, as soon as juror 26 said this, the court itself noted, said, well, a lot of the events at trial that you're going to hear about happened in that area. So the court itself also recognized that juror 26's ties were significant here. And juror 26 also revealed on his questionnaire that he worked for the Peoria Housing Authority, which managed the Harrison Homes Housing Project, which was another kind of a heartland piece of territory for the bomb squad. There were a number of shootings that happened at Harrison Homes. The bomb squad operated an apartment there where they dealt drugs and stored firearms. The fact that juror 26 worked for the Peoria Housing Authority actually prompted another defense attorney to say in chambers, the defense counsel wanted to ask this juror more questions about his work at Peoria Housing Authority, given the number of incidents that happened there. And so all of this goes to show that by the time the government exercised its peremptory challenge on juror 26, it was very clear why the government was doing so from the record. It begs the question for me, why not a strike for cause? I'm not sure that the district court wouldn't have granted a cause strike here. The government didn't move for a strike for cause. If you read back through the voir dire transcripts, the government was pretty limited. The government was taking a position generally that most jurors should not be struck for cause. So the government did not take that position here. But I think the fact that the defense attorneys and the district court had both made observations with respect to juror 26 that acknowledged these things. I'd also like to talk about the white juror that the government struck at the same time, juror 154. Juror 154 had taught for 32 years at Harrison, which was an elementary school in the same area. She recognized some of the defendants' names and she thought she might have taught some of them or some of their relatives potentially. It also turned out at trial that at least three witnesses attended Harrison Primary School. Juror 154, who was white, also had strong connections to this area. The fact that the government struck her at the same time is consistent with the notion that the government was striking juror 126 because of his ties to this area. Now, also with respect to juror 58, she... I'm going to stop you there because the government clearly waived multiple opportunities to give race-neutral reasons for striking juror 58. And why shouldn't we hold the government to that waiver? The district court gave the government a lot of warning and even some advice on the wisdom of not making a record when it had the chance. Now, here we are after an eight-week trial and the government is talking about that if we find a Batson violation, giving the government what seems to be a fourth bite at an apple on race-neutral reasons. The government took a gamble with that strategy. And now here we are. Help me with this, please. So, I would like to disagree with Your Honor with the premise that the government waived anything here. The district court was very clear that it had not found a prima facie case at step one. The government was therefore not required to proceed to step two and give race-neutral reasons for juror 58 or juror 26. The district court then, after making it clear that it had ruled in favor of the government on the prima facie case, the district court then asked the government to give reasons for both juror 26 and juror 58. Look, the district judge came back into the court, right, and had obviously thought about something here and asked you to do it. What he said was something like, look, in an abundance of caution, make a record. Make a record, I think he said something like, so we have clarity for the record. And the defendants, as I recall, actually objected to what they thought was a second bite here. So, it's saying that the government already had two opportunities to produce race-neutral reasons that declined, resting on the prima facie case. And I think that at that time, the defendants also noted that the court had announced it would not change its ruling. But look, as you can see, I'm concerned. Yes, no, but I think that the fact that the court made it clear that it was resting on the prima facie case, the creating of the record wasn't about proceeding to the second step of Batson. That was about wanting to create a record for this court. And I think this court should look at what happened after the government gave reasons for juror 26, which the government did do. What about reasons if not the second step of Batson? Reasons equals the second step of Batson. The district court then made it clear that, you know, I'm resting on the prima facie case. The reasons are for the review of the court of appeals on the record. But counsel, it is striking on this record that the government was in the same position with regard to juror number 26 and 58. The court had stated it found that the defendant had not satisfied a prima facie case for either of those cases. And it's striking that the government is able to provide reasons for 26 and yet declines to give reasons on 58. If the government believed that it was a way of preserving its legal rights under the three-step analysis, the government could have said, Judge, you know, given the fact that you have not found a prima facie case here, we are going to stand upon that argument and not give reasons for 26 or 58. But what it did was it gave reasons for one and then, interestingly, didn't give reasons for the second. And I think to some extent that is troubling to me because whether or not this fits in with the scenario under U.S. v. Johnson, it does make – it does give one pause looking at the record to say, well, perhaps the government didn't have any reasons to give for 58 and therefore stood on its legal grounds. So help me – can you explain to me why it was the government chose to give reasons for the first but not for the second? So I think if you look at the transcript about how things were evolving, I think the government was following the district court's lead because the government gave reasons for 26. There was a discussion about that. And then the district court moved to 58 but sort of lost interest. The district court said multiple times, I believe, that what I was really concerned about was juror 26 and then said, if you want to give something on juror 58, this is your chance. But the court ultimately said, if not, no worries. That's a direct quote from the district court. No worries with respect to juror 58. So the district court was – Pretty hesitant. Hispanic accent. Nor did the government deny that these were the only two possible jurors of color on the initial panel. And the court itself noted the juror's dark complexion. Why is striking every juror of color not enough to meet the prima facie facts and case at that point? I am really asking for your help here. Yes. Well, Your Honor, the district court said it was unable to make a finding as to this juror's race or ethnicity, notwithstanding the fact that the district court memorialized for the record. He just said race. I took the correction, Your Honor. I thought that ethnicity was discussed as well. But regardless, the – But it's not the plaintiff's burden to prove at step one by preponderance of the evidence, right? Or if I'm wrong, you can correct me, that the juror number 58 was someone that was definitively a member of a protected category. Rather, isn't the standard that, you know, so long as the defendant provides enough to raise the suspicion that that might be the case, that that would satisfy the defendant's obligation to step one? Isn't the problem here that the court just put the defendants to too high a burden and applied the wrong legal standard in trying to determine whether or not defendants satisfied step one? And if so, that would be de novo review, right, as opposed to clear error. And so isn't that what we're dealing with here based upon what the court stated earlier on in the proceedings? I think that there was one place where he says, let's see, I must make a determination as to whether the side claiming racially discriminatory preemptive challenges has carried its burden of proving purposeful discrimination. And I don't think the record would support that you have done so. That is an incorrect articulation of the defendant's burden as to step one, is it not? You're correct, Your Honor, that that I think is an inartful phrasing. I don't think that it's fair to infer from that that the fact that those were the words the district court used, that that meant that the district court was applying the wrong standard. The district court repeatedly referred to the prima facie case, which indicates that the district court understood the three step back in process. Well, the district court certainly understood the three steps. I'm not disputing that. What I'm saying is I'm trying to look at what standard the court believed that the defendants had to meet in order to make a prima facie case. And I'm looking at appellate record, the appendix 211, where the district court says that the defendant has to carry its burden of proving purposeful discrimination. With regard to step one, if that's what the district court said, why shouldn't we hold the district court to believe what the district court said it was doing at the time? Well, as a special matter, I don't think that the defendants have made that argument. But setting that aside, I do think that this is something that would be a plain error question. Well, if the court applied the wrong legal standard, that would be de novo, right? If the court applied the wrong legal standard, I think that could still fit in the clear error framework, because obviously it would be a clear error for the district court to apply the wrong legal framework if that happens. But I don't think that happened here. And I think that's because the district court made it clear that it understood the three step Batson framework. The third step of the Batson framework is that the defendants at that point have to prove that intentional discrimination motivated the strike. The district court made it clear that it knew that there were these three steps. I think it was just an inartful statement by the district court. And the fact that the district court was so careful with respect to this first step and wanted to make findings and all of these things, I think shows that the district court knew that it was thinking about this. The district court came back after lunch. It referred to having books. I think that shows that the district court was kind of checking the law on Batson. And if it had kind of realized it had committed an error, I think it would have, you know, if it had been applying the wrong standard, I think the district court would have done something to indicate that. But I'd like to talk a little bit more about Juror 58 also, because I think that... While you do, the court said that no one knew the race of Juror 58, noting that her name would be in the record. There could be speculation based on her skin color, the fact that she teaches Spanish. Okay, but that would be it. Quote, that would be it. Okay, the prosecutor, again, chose not to give a race neutral reason for striking 58. And I am going to quote the exact words. Quote, I don't believe the government's appropriately in a position to give a race neutral reason as to that Juror 58. End quote. I don't know. I haven't seen anything like that previously. So I think when you look at that statement in the context of the discussion and the arguments that have been leading up to it, I think what the prosecutor is referring to there is focusing on the fact that the prima facie case had not been made, and so that as a legal matter, the government was not required to proceed to step two and give reasons. And I believe the prosecutor made that statement after the district court signaled that it didn't actually care as much about the government giving reasons for 58. I believe the government said that. I just read you or said that I thought what the judge said was that's it. But what does it mean to not appropriately be in a position to give a race neutral reason? I understand why your Honor stops at that phrasing. But I think that this was a way perhaps in an artful way of saying that the government is not legally required to give a reason because we have not passed the first step of BASN. Does the government have a good safe basis to dispute the claims of defense counsel that the final needed jury was all wait? Or are you simply resting on the lack of evidence in the record to that effect? Your Honor, I genuinely do not know. And the reason we do not know is because the defendants did not make a record of this. The defendants, if they had wanted to show that the government had struck the only two non-white jurors in the veneer, the defendants could have, after every voir dire panel, they could have said we note for the record that every veneer person who came through this panel was white. They could have said when the jury was seated, we note for the record, they renewed their BASN challenge at the end of jury selection. They could have, if they had wanted to at that moment, they could have said and we note for the record that the defendants are going to be tried by an all-white jury. They didn't say that. They also filed post-trial motions. They could have filed a declaration or an affidavit in support of one of the post-trial motions saying this. Presumably at the time, everybody would have known. On a cold record, I do not know. But the reason I do not know is because the defendants did not make a record on that front. Isn't the flip side that if it were not an all-white jury, the government would have told us by now? Your Honor, I can't tell you one way or another because there's nothing in the record for me to make a representation about that. That's our problem. Our problem is the record. That's our problem. And the defendants had the burden. To say that the judge said this was an inartful statement, my goodness. Where would we be if every time a judge says something, the government would come in and say, well, it was inartful. We only can stare at the words that were said. Yes, I understand. But I think that this is a situation where the defendants were raising a baffling challenge, and they did renew it multiple times, and they bore the burden. They could have built a record, and they didn't. And I think I see that you could draw inferences either way about that. But I think if the defendants believed that there had actually – if it looked like this was discrimination, if it seemed like this would bolster the defendant's case, presumably they would have brought that fact out. They would have said – But counsel, they tried, right, to some extent. They asked the court whether they could ask juror number 58 additional questions with regard to her background. And they were prohibited from doing so. Yes, you're right. They asked for a board hearing after the district court had already indicated that it believed that they hadn't made out a criminalization case. But that was a correct ruling for a few reasons. What matters for purposes of Batson is what the prosecutors might have perceived in the courtroom. So the jurors' answers to that question wouldn't have shed light on that. What matters is that the judge was equally able to see what was perceived in the courtroom. But I also think, you know, we want jurors – We don't understand that argument. You'd better go back. Yes, so what matters is whether there are circumstances that occur during jury selection that would allow the trial judge to draw an inference of discrimination. And the circumstances that were present at the time of the Batson challenge are what the court and the attorneys were able to observe in court. And whatever juror 58 might have said after the fact is extraneous. And, you know, this court, I think, in Williams v. Klans and a few other cases, these kind of post hoc voir dires don't really shed light. But I want to also just pull back and focus on the fact that what this voir dire would have been about would have been race and ethnicity, presumably. And we want to keep race and ethnicity out of the jury selection process. This is a juror who the government had already peremptorily challenged. And although the juror might not have known that yet, the district court seemed like it was going to uphold that peremptory challenge. So the idea that you would bring juror 58 into the courtroom, ask her about her race and ethnicity, and then inform her that she had been struck from the jury. Because the district court had already said, no matter what her answers were in voir dire, I would find that you haven't made a prima facie case. What would juror 58 be left thinking after that experience? And so I think it was very reasonable and appropriate for the district court to say that voir dire was not appropriate in the circumstance, especially because the district court said, regardless of juror 58, that whatever came out during that, that it would not change the district court's ruling on the prima facie case. Counsel, I'm still troubled by this idea that, although it is the defendant's burden on Batson, I take that, that the question isn't just beyond what you personally know about the composition of the jury. I take it that you don't know, but you represent a unitary client. It's the United States government and the Department of Justice and all the U.S. Attorney's Office. So I'm not certain that we should not also consider the fact that just as the government is saying, after the fact, that our reasons for striking juror number 58 are apparent on the record. The government's made that argument. While it's also said we had no obligation during trial to provide those very apparent reasons, but here they are in our brief. Why aren't we to take into account there's an absence on this other question about the ultimate composition of the jury, the composition of the subsequent panels, over and beyond what you personally know? Yes, Your Honor, and I don't really want to get into the internal work that the Department of Justice has done, but to the extent that I've attempted to figure this out, I've not been able to figure it out. And so I just candidly, I do not know. I cannot make representations to the court one way or another about the composition of the veneer. I wish I could, because I wish we had a record here that revealed that, because I think as this Court's cases unbatch can show, that's a really important factor that is present in almost every case. This case is unusual in that we don't have that kind of record here. And I understand that the court may wish the government had done more to build up the record as well, but we were not the ones bringing the BASM challenge. And so the record is what it is. I see I don't have very much time left. I'm happy to keep answering questions about the BASM issue, but I was hoping I could maybe also run through some quick responses to some of those questions. Of course you can. We've given extra time to the defendants, and we're going to give you the same courtesy. Okay, I appreciate that. And I will try to be quick on these, although of course if the court has questions, I'm happy to answer them. So with respect to the sufficiency of the evidence supporting Watkins' RICO conspiracy account, counsel suggested that we had the burden of showing that Watkins personally committed to predicate acts. That's actually not what RICO conspiracy requires. All RICO conspiracy requires is evidence that he agreed that two or more BOM Squad members, that he agreed that a BOM Squad member would commit to a more active racketeering. I think we have that here. I am going to stop you because look, this is our only opportunity, right? And it's very important. Watkins was acquitted on Camps 32 and 33, which involved that shooting on Griswold Street. What is the government's best evidence to be either committed two acts in furtherance or agreed that other BOM Squad members would commit two acts in furtherance? If we count the transfer of the gun at the Bradley University party as one agreed act, what is the best evidence of an agreement to commit a second act? So we cited several in our brief. You've referenced the shooting on Griswold. That is one, even though the jury acquitted on that count, that doesn't mean that there was insufficient evidence to support it. There were two witnesses who described how they had a conversation with Jovan McCree, who was with Watkins at the time of the shooting, that Jovan described it to them. And one of them actually picked McCree up after the shooting. Witnesses in the area also reported hearing gunshots in the vicinity on December 20, 2017. But even setting that aside, there was the evidence that Watkins, that Cameron Crowe, another BOM Squad member, would give him his gun when he was at work. That indicates that Watkins was perhaps holding the gun to make sure that it was available for other BOM Squad members. The evidence showed that the BOM Squad would in fact share guns with each other for the shootings that they would commit. And the fact that Watkins actually passed the gun to someone at the Bradley party supports the inference that he was somebody who played that role within the BOM Squad. And then there was also evidence that he had agreed to participate in the gang's drug dealing activity. He appeared on a Facebook Live video that was advertising the sale of marijuana. And he also was in a BOM Squad hangout at Harrison Homes when a search warrant was executed there. That was where the gang sold a lot of marijuana and they had guns there. Watkins contends that the government expressly abandoned any reliance on Overt Act LL at sentencing. Is that true? Because if it is true, I'm wondering how the government can ask us on appeal to rely on LL if it abandoned the theory below. Yes, well the fact that we didn't rely on it at sentencing, that goes to a different issue. And frankly, the evidence against Watkins, there was so much to be considered at sentencing that for purposes of calculating his guidelines, his guidelines would not be affected by that event. And so the government just didn't rely on that at sentencing, but that doesn't signal that there was insufficient evidence to allow the jury to find that that was an act of racketeering in furtherance of the conspiracy. So I'm happy to answer more questions on that. I see that I'm out of time. I don't know if... I want you to do what you came here to do. So are there, I mean, do you want to argue about any of the other defendants here? Your Honor, I can give you a short argument on each of the ones who argue, but I also, I don't want to, you know, overstay my welcome if the court... You, none of you can overstay your welcome as far as we are concerned. Okay, well I will try to be brief and please feel free to either interrupt with questions or to cut me off if you'd like me to move to the next issue. So with respect to the sufficiency of the evidence with respect to Watkins, there was a lot of evidence that Watkins committed these crimes other than in his confessions to them, to other Bond Squad members. The bullet evidence, the fact that another Bond Squad member saw him with a gun 30 minutes after the shooting, the fact that Watkins knew about the shooting 30 minutes after the shooting, there were things that the shooting victim said that lined up with what Watkins said and what Crowe said. Also for corroboration, the only evidence that the government actually needs to corroborate a confession where there's a physical injury is evidence that the physical injury occurred and someone is criminally responsible. So in that respect, all we needed to show was that somebody shot Martel Perkins and we know that here, so that was sufficient corroboration. Unless the court has questions about that, I will quickly move to the Dockton disqualification issue. There was no ethical issue with respect to one of the prosecutors, his role in the case, and Mr. Hanna, I will say by the way, is still employed at the U.S. Attorney's Office. That came up earlier in the argument. But there was no ethical problem with his participation. His former client has never objected to his involvement in this case and there's no basis to think that he either used or revealed any information relating to that representation. Let me tell you what I find really interesting here. If we translated Mr. Hanna's prior representation to the civil context, wouldn't this be an obvious conflict of interest? I mean, in other words, for example, if Mr. Hanna represented a company as a defendant in an employee race discrimination suit, he'd gain a lot of inside information about how the company handles these things, whether they've settled cases, which managers are problematic, etc. So now assume he opens his own law firm. And he represents a different employee, suing the very same company for race discrimination. Now he's on the plaintiff's side, right? Clearly the company is going to seek and obtain his recusal. So my question to you is this. Should the court have allowed an unfair advantage on the part of the government, which now has inside information on the group and its workings? Regardless of anything else, Mr. Hanna knows a lot. About this group. So I would first like to say I don't think that there was anything unfair here. And we know that from the trial testimony, the government had four bomb squad members who testified in detail about the gang and its inner workings. That information is available to any prosecutor who worked on the case. Mr. Hanna didn't need whatever information he may have gleaned from his former representation of Mr. Heron, which again, there's nothing on the record to indicate that he said that he wasn't going to use that. The defendants don't dispute, they don't really dispute that he didn't. They instead say that maybe you could infer that he did. But also the hypothetical that Your Honor posed about the civil company, in that case the civil company is actually a party in both cases. So if the lawyer goes from representing the civil company and then goes to litigating against the civil company, that really is switching sides. But here, the client was Mr. Heron. And Mr. Heron was not involved at all in the second prosecution. He was not a defendant and he was not a witness. And so it's not an analogous situation, I would say, in that respect. And I do want to ask you the question that I asked earlier. At the time of the events, do we know how many members there were of the bomb squad? You may wonder why I ask such a question and I'll tell you why. The smaller the group, the bigger the problem. It is that Mr. Heron had inside knowledge about the bomb squad when he became a lead prosecutor. Do you understand where I'm coming from? Yes, I understand. What was the idea of the number? I don't think the gross numbers were ever discussed in the record. But I think given the number of players involved in all of these different crimes, I agree with Mr. Dotson's counsel that it seems like the gang was pretty large. So I'm happy to answer more questions about that. Let me just quickly also address Mr. Haywood's arguments about Eric Brown's murder and Courtney Jones's shooting. With respect to Eric Brown's murder, the government certainly is not saying that who was on the bicycle is dispositive of this case. There was a lot of evidence that Haywood was the person who committed this murder. He asked for a gun before the murder because he was mad about rival gang members chasing him near Western Avenue, which is where the murder occurred. He then set off on bicycles after recruiting fellow gang member Ezra Johnson to go with him. Eric Johnson was shot by two people on bicycles, who bomb squad member Faulkner identified as Haywood and Johnson. And then after that shooting happened, Haywood came back to the same bomb squad hangout that he had been at before, and he said, I went and shot at the guys who shot at me. And he still had the gun that he had borrowed. So this question about who was on which bicycle, I think all of that evidence, the jury could, it was overwhelming and a reasonable jury could certainly infer from that evidence that Haywood was the person who fired the trigger. And to the extent, we talked in our brief about why the jury did not, you know, didn't need to believe that he was the bikes and the hacks, but I would say that to the extent that there was any conflict between all of that evidence, that Mr. Haywood was guilty, and the testimony about the bikes and the hacks, the jury was certainly free to disregard that testimony. And on the sufficiency of the evidence review, this court has to assume that that's what the jury did. And then with respect to the Courtney Jones shooting that was witnessed by a 14-year-old DD, Mr. Haywood's counsel argues that the admission of that evidence was not harmless. We disagree with that for the reasons we said in our brief, but I'd also just like to say that, you know, the first question is whether the district court abused its discretion in admitting that evidence in the first place, and we explained why there were four different bases to support the district court's decision with respect to that statement. So we will rest on our briefs with respect to that, unless the court has further questions. I'm happy to answer any other questions the court may have, but otherwise we will rest on our briefs and ask the court to affirm. Judge Ropner, could I ask one more question? Absolutely, please. Thank you. So if we find for the defendants with regard to the Batson issue, the parties dispute as to the scope of the remand that is appropriate here. Can you address the government's positions with regard to what it believes the appropriate scope of remand should be? Yes, we'll be late on our brief. We think that the government should have the opportunity to give its reasons with respect to Juror 58, and just for the record, the government did say during the colloquy about this at the time that it had race-neutral reasons, so I want that to be clear. The government didn't share them, but the government did say we have race-neutral reasons. We should have the chance to give those reasons with respect to Juror 58. Because the government has already given reasons with respect to Juror 26, those are the reasons, I think, that would be the reasons moving forward, that the district court should proceed to the third step with respect to both jurors. Again, we don't think that a remand is warranted here because we do think that the district court got the prima facie step right and certainly didn't commit clear error in that respect, but that would be our position on the remand. Given the fact that the attorney for the government in charge of the case that was in charge of the voir dire is no longer with the office, how exactly would the government go about doing that in that situation? There were three AUSAs who were involved in the voir dire process. If you read the record, it's clear that they were discussing with each other the basis for strikes, and two of those AUSAs are still employed at the U.S. Attorney's Office. That's outside the record, but I can represent that to this court. So we have that. But again, we don't think a remand would be warranted here. I had the feeling earlier when you were discussing this that you believe that a remand would basically be useless. Am I just completely wrong about that? Well, we think a remand is... I don't want to suggest that I think the government would... If this case were remanded, I think the government is confident about the result that would come out of the remand. But I think it would... I don't think that anything... I think that there is no inference of discrimination to be drawn here from this record, and so the remand, there just isn't a basis for getting there. So I don't mean to suggest that there would be... that the government would be unable to move forward with remand proceedings, because we certainly could. We don't think that this case warrants them. Okay. Guess what? You may sit down. Thank you, and thank you for the court's indulgence. You're very welcome. Thank you. Ms. Eisenman. Thank you, Judge. I know you've been so generous with time. I will not take long. No, this is, you know... This is... This is why we're here. Well, thank you, Judge. I appreciate it. And so do our clients. I just want to start at the end. It's our position that this case has to be remanded. It's just a matter of how. For Juror 26, the government gave reasons. When the government gives reasons, you skip to Step 3. Step 1 is moved. And at Step 3, everybody agrees there were no credibility findings. So at the very least, this has got to be remanded to do Step 3 for Juror 26. A couple of other points. Judge Jackson's comments about why there was no cause for striking Juror 26 when he apparently had all these connections with the areas of Peoria. That's a red herring. That is not supported in the record. They had suspicions that he might be, but that's why they followed up. And the district court asked Juror 26 point blank, after the initial kind of juror conference, do you know anything about the allegations in the complaint? And he said, no. I went to work, I went to church, and I went home. That's exactly what he said. He doesn't know anything about this. He was not at the housing authority when these events took place. He doesn't know any of the witnesses besides the county clerk who he attended one luncheon with. And if he knew a victim well, that would be a good thing for the government. He would sympathize with a victim of the defendant. When you say attended a luncheon with, you just mean that they were both at the luncheon. Exactly. Not like they were paired together. I think he even said he was not even at her table or something like that. He recognized her name. And so that is just, it does not support that they had these close connections with areas of Peoria. And again, 58, if it was so obvious that she had connections with Peoria, why didn't the government say that on the record? That was Judge Lee's point. It's a great point. It's not there on the record. Errors of law, you also talked about Judge Lee. Errors of law satisfy any standard of review. So it doesn't matter. It doesn't matter if you're looking at abuse of discretion. There's an error of law, whether it's the judge saying burden of proof a couple of times instead of burden of production. Whether he's saying that you had to show a pattern. Whether it's him saying that you have to make some sort of threshold race finding before you can even go to step one of Batson.  And that is reversible error under any standard of review. Judge Roepner's comment about being waived. You cited that, the transcript perfectly, Judge. It's in the appendix 222 and 224. The government was not following the court's lead. I disagree with that. The court asked twice, twice. It seems silly that we would do this twice. I'm going to ask you for your race-neutral reasons as to 26 and 58. Next page. I'm going to ask them to make a record as to why 58 and 26 were excused. The court asked them twice to do that and twice they denied it. And it's pretty ironic that the government is here saying that the defendants are at fault for not making a record about the final composition of the jury when the government was given every opportunity to make a record regarding why it struck 58 and it refused to do so. I wish it was on the record that it was an all-white jury, but the best I have is that several counsel on appeal were trial counsel. They have told me as officers of the court it was an all-white jury. All of our clients have confirmed to us that it was an all-white jury. I wish it was in the transcript. I know it's not, but it's a little ironic when the government was asked to make a record regarding 58 and they refused to do so, whereas the defense had to really assert itself just to get any sort of record regarding Batson in this case. So unless there are any other questions, I would ask this court to reverse and remand for a new trial for Mr. Watkins unless his conviction is reversed altogether. Thank you. Ms. Masters? I'll be brief, Your Honor. The law in this circuit is that an uncorroborated confession is generally insufficient to support a conviction. The government must provide quote, substantial independent evidence which would tend to establish the trustworthiness of the statement and all elements of the crime have to be established by independent evidence or corroborated admissions. Can you address more directly Wong-Sun and the government's point to us in the brief and again now that under Wong-Sun they don't have to do much more when you've got this confession than provide that physical evidence that Perkins sustained a bullet wound? Yes, absolutely. Because the distinction between Wong-Sun in this case is that the victim who was the only eyewitness actually walked into court and said it's not the defendant who did this crime. I'm 100% sure of that. So you can't just say a crime has been committed when the victim comes in and says it's not Mr. Washington who did it. There has to be more and that's where you get into the test in the circuit about the substantial corroborating evidence. I also want to take one moment and just address the government's reliance on Mr. Moss's testimony that my client showed up at his house afterwards with a gun and supposedly was putting it on Snapchat that he did this crime. To be entirely clear the government's report of interviews and they conducted five interviews with Mr. Moss don't contain any of this information. There's no indication Mr. Moss ever said this to the government so his ROI does not corroborate even what he says is this supposed confession. And the other point is that the government again they had all of this opportunity to show that these Snapchat accounts existed. They don't. There's no corroboration that any of this ever went out on Snapchat. There's no corroboration that even Mr. Perkins or my client Mr. Washington had Snapchat accounts. So the government is way out of line to suggest that uncorroborated statements supposedly put out on Snapchat even foundationless statements is what they really are can somehow corroborate a confession. And with that I would ask that Mr. Washington be acquitted in the least again we would renew the request that he have a new trial on these claims. Thank you. Thank you very much for all of your time. Thank you very much. Mr. Keller you didn't ask for time but I'm going to give you two minutes if you want it. Thank you Judge Robner. Very briefly the murders of Raheem Wilson and Tyran Chester those were two events which were catalysts for much of the violence and much of the prosecution's focus in these cases. And those two murders they have their roots in the year 2013. And that is when Raheem Wilson basically declared war on Mr. Chester. And 2013 is obviously very important because the prosecution Mr. Hanna was representing the bomb squad at that point. So these were two seeds that were planted during 2013 and during that defense representation and those bled over into the second prosecution. And that's an important fact vis-a-vis Mr. Dodson and also Mr. Flora because for Mr. Flora that is when he was charged with his actions regarding the murder of Mr. Chester. Judge Robner asked your question about the civil context. The civil context is spot on. It's precisely the concerns that we have here and that the prosecution frankly has glossed over. This again is an unusual situation. It's an anomaly. There's not really any case law that's on point with this and frankly that's why we had to use other contexts such as the joint representation successive representation cases because there's nothing like this. There's nothing like a situation where you're defending one gang and then prosecuting it in a very short time frame. So again that unusual nature of this should give the court pause and just to wrap up what we have here are frankly two structural issues and I recognize Batson is completely distinct from this issue but when you look at the case in the wider context you have two very significant constitutional concerns with Batson and with this recusal and these are two issues that impact and undermine the integrity of this prosecution and I recognize this was a large case and remanding would be a significant remedy but the wrongs here that happened with these two issues when you combine them it really should motivate this court to do so and if there are no further questions thank you for your time. Thank you and Ms. Kelly you didn't ask for time but two minutes for you. Thank you Your Honor. I would just like to address the hearsay statement of Officer Carnell and again I want to stress the point with hopefully not beating a dead horse. There is no federal rule or case law that allows a judge to submit the statement as an excited utterance but then when a second witness comes in and makes the exact same statement to allow that statement in as an excited utterance. Officer Carnell's statement was made much I mean Mr. Jones' statement to Officer Carnell was made much later in time than Dee Dee's statement to Mr. Jones. For a judge to rule for Mr. Jones to say it is hearsay but for Officer Carnell to say it is not hearsay. There is no law or federal rule that supports such a finding. That's all I have to say Your Honor. Thank you so much. Now I just need to say a few things. The first thing I want to say is every last one of you as far as I know you in the courtroom including you who are with us via Zoom lawyers one and all were appointed by the court and you have the deepest thanks of this court for representing your clients in a very fine manner. We thank you. And of course as always we thank the government for its hard work and dedication to public service. So with that with the thanks of the court we will take this case under advisement. We will take a 10 minute break at this point. But no matter what the rest of you in the courtroom wish we are coming back. Okay.